IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: _____ |
| | ) | |
| NEW LIFE CENTER FOR CHANGE, | ) | **JURY TRIAL DEMANDED** |
| INC. d/b/a TEEN UNIVERSITY, and | ) | |
| ALFONZA SMITH, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Comes now the United States of America, by and through Kevin P. Davidson, Acting United States Attorney for the Middle District of Alabama, and respectfully files this action pursuant to Federal Rules of Civil Procedure 8 and 9 against Defendants New Life Center for Change, Inc. d/b/a Teen University ("Teen University"), and Alfonza Smith ("Defendant Smith") (collectively the "Defendants").

## I.    INTRODUCTION

1.    This is a civil action brought by the United States against the Defendants under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–33, and the common law, to recover treble damages sustained by, and civil penalties and restitution owed to, the United States based on Defendants' illegal scheme to (a) knowingly present, and cause to be presented, false or fraudulent claims to the joint state and federal health care program Medicaid, for Basic Living Skills ("BLS") services not provided and not properly documented; (b) knowingly make, use, and cause to be made or used, false records and statements material to the false and fraudulent claims in the form of false BLS notes; and (c) knowingly conceal and knowingly and improperly avoid or decrease an

obligation to pay or transmit money to the Government by failing to repay the overpaid Medicaid amounts.

2.      Despite being entrusted with juveniles in need of intervention, Teen University failed to provide needed BLS services to many of these youth. Teen University knowingly presented to Medicaid false claims for BLS services that Teen University did not provide as it certified that it had. Teen University then made false records to try to cover its false and fraudulent claims for payment by creating false BLS notes for services not rendered. Teen University's Chief Executive Officer Defendant Smith actually knew, was deliberately ignorant, or recklessly disregarded Teen University's practices in which Teen University's employees presented false Medicaid claims and created false records to cover its false and fraudulent claims for payment. When confronted with these practices, Teen University and Defendant Smith had an obligation to repay any overpaid amounts to Medicaid, but they have failed to do so.

3.      Teen University operates Teen University Residential Group Home, which advertises itself as "help[ing] adolescent males and their families triumph over their challenges and grow into healthier, contributing members of their community." Teen University has described the mission of its residential male group home as "providing effective and quality intervention services that impacts the critical needs of male youth in crisis."

4.      Teen University contracted with the Alabama Department of Human Resources ("DHR") to provide room, board, and services to children with moderate emotional and/or behavioral management problems. Teen University was supposed to provide BLS services to enable the children entrusted to its care the ability to return to their families or communities with better capacities to live independently and thrive in society.

5.      Teen University routinely billed Alabama Medicaid for two hours daily of individual BLS sessions, worth $112 (8 units x $14), and one hour daily of group BLS sessions, worth $16 (4 units x $4), for each resident entrusted to its care. By submitting a claim, Teen University certified that it provided the BLS sessions and that it complied with applicable requirements, including a requirement to maintain daily progress notes and other documentation to support the claims should Alabama Medicaid or DHR wish to verify the claims or audit Teen University.

6.      But Teen University did not provide the majority of the BLS services it certified.

7.      Instead, in response to an investigation conducted by the Alabama Attorney General's Medicaid Fraud Control Unit ("Alabama MFCU"), Teen University created false BLS notes to support the claims it previously submitted to Medicaid.

8.      A review of the records provided to Alabama MFCU revealed a wide variety of discrepancies indicating that the claims and supporting documentation were false and fraudulent, including but not limited to:

   a. a complete lack of BLS documentation to support some of the Medicaid claims;

   b. resident documentation showing that residents were not on campus during some of the BLS sessions allegedly provided to them; and

   c. a single employee purportedly providing individual BLS services to multiple residents at the same time.

9.      Interviews conducted with Teen University employees further revealed fraudulent billing and documentation practices. Numerous employees admitted that Teen University management asked them to write BLS notes that did not reflect BLS services they provided, or to sign BLS notes that they did not write and that, again, did not reflect BLS services they provided.

10.    Defendant Smith actually knew, was deliberately ignorant, or recklessly disregarded that Teen University was submitting false Medicaid claims and that Teen University employees created false records in response to Alabama MFCU subpoenas to support the Medicaid claims.

11.    When these fraudulent practices were brought to Defendant Smith's attention, Defendant Smith and Teen University had an obligation to refund the overpaid amounts to Medicaid, but Defendants failed to do so. Defendant Smith never directed Teen University employees to identify the Medicaid overpayment amounts and return the money.

12.    As a result of this fraud, the United States and Alabama, through the jointly funded Medicaid program, has paid Teen University Medicaid monies to which Teen University was not entitled.

## II.    PARTIES

13.    Plaintiff United States brings this action on behalf of the Department of Health & Human Services ("HHS"), and its component agency Centers for Medicare and Medicaid Services ("CMS"), which administers the Grants to States for Medical Assistance Programs pursuant to Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq*. ("Medicaid").

14.    Defendant Smith is an adult resident of Lee County, Alabama.

15.    Defendant Smith incorporated New Life Center for Change, Inc., on December 08, 1998. New Life Center for Change, Inc., d/b/a Teen University, is an Alabama Domestic Non-Profit Corporation formed in Russell County, Alabama, with a registered office address in Lee County, Alabama. Teen University operates a 24-hour residential treatment program for juveniles in Phenix City, Russell County, Alabama.

4

### III.    JURISDICTION AND VENUE

16.      This action arises under the False Claims Act, as amended, 31 U.S.C. §§ 3729–3733 ("FCA"), and the common law. This Court has jurisdiction over the subject matter of this action pursuant to 31 U.S.C. § 3732 and 28 U.S.C. §§ 1331, 1345 because this action is brought by the United States as a Plaintiff pursuant to the FCA. The Court has supplemental jurisdiction to entertain common law or equitable claims pursuant to 28 U.S.C. § 1367(a).

17.      This Court may exercise personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendant Smith resides in Smiths Station, Alabama; Teen University transacts business and has its principal place of business in Phenix City, Alabama; and relevant acts proscribed by 31 U.S.C. § 3729 occurred in this district. Teen University prepared and submitted false claims to the United States and the State of Alabama in and from this district. Teen University created false records material to those false claims within this district. Teen University and Defendant Smith improperly avoided an obligation to pay the government within this district.

18.      Venue is proper in the Middle District of Alabama pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) because Defendant Smith resides in this district, Teen University transacts business in this district, and Defendants committed acts within this district that violated 31 U.S.C. § 3729.

### IV.    FACTS

**A. Applicable Statutes, Regulations, and Contracts**

   **i.  The False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.***

19.      The FCA reflects Congress's objective to "enhance the Government's ability to recover losses as a result of fraud against the Government." S. Rep. No. 99-345, at 1 (1986), *available at* 1986 U.S.C.C.A.N. 5266.

20.    The FCA establishes liability to the United States for an individual who, or entity that, "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A), "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," *id.* § 3729(a)(1)(B), or "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the government," *id.* § 3729(a)(1)(G).

21.    The FCA defines "claim" to include "any request or demand, whether under contract or otherwise, for money" that is "presented to an officer, employee, or agent of the United States," or "is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government . . . provides or has provided any portion of the money or property requested or demanded," or "will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2).

22.    The FCA defines "obligation" as an "established duty, whether or not fixed, arising from" a contract, statute, regulation, or "from the retention of any overpayment." 31 U.S.C. § 3729(b)(3).

23.    "Knowingly" is defined to include actual knowledge, reckless disregard, or deliberate indifference. 31 U.S.C. § 3729(b)(1). No proof of specific intent to defraud is required. *Id.*

24.    The FCA defines "material" to mean "having a natural tendency to influence, or to be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

25.    It is a violation of the FCA to retain an overpayment. *See* 42 U.S.C. 1320a-7k(d). An "overpayment" is defined as "funds that a person receives or retains under subchapter XVIII

6

or XIX of this chapter to which the person, after applicable reconciliation, is not entitled under such subchapter." 42 U.S.C. § 1320a-7k(d)(4)(B).

26.    A person receiving an overpayment must report, return, and give the reason in writing for the overpayment to the Secretary, State, intermediary, carrier, or contractor as appropriate. 42 U.S.C. § 1320a-7k(d)(1)(A). The overpayment must be reported and returned within 60 days after the overpayment is identified or the date any corresponding cost report is due, whichever date is later. 42 U.S.C. § 1320a-7k(d)(2)(A)–(B).

27.    Any "overpayment retained by a person after the deadline for reporting and returning the overpayment . . . is an obligation (as defined in section 3729(b)(3) of Title 31) for purposes of section 3729 . . . ." 42 U.S.C. § 1320a-7k(d)(3).

28.    The failure to return any overpayment, such as each of the claims on which Teen University received an overpayment from Medicaid, constitutes a "reverse false claim" actionable under § 3729(a)(1)(G) of the FCA.

29.    Under the Act, the Government is entitled to recover three times the amount of each claim, plus, for each claim or overpayment, a civil penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990.

### ii. The Medicaid Program.

30.    The Medicaid Program was established in 1965 pursuant to Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*, as a joint federal and state program to provide financial assistance to individuals with low incomes to enable them to receive medical care. The Medicaid program pays for services pursuant to plans developed by the states and approved by HHS through the Centers for Medicare & Medicaid Services ("CMS"). *See* 42 U.S.C. § 1396a(a)-(b). States pay doctors, hospitals, pharmacies, and other providers and suppliers of medical goods and services

according to government-established rates. *See* 42 U.S.C. § 1396b(a)(1), 1903(a)(1). The federal government then pays each state a statutorily determined percentage of "the total amount expended . . . as medical assistance under the State plan . . ." See 42 U.S.C. § 1396b(a)(1). This federal-to-state payment is known as federal financial participation.

31.    CMS, a component of HHS, administers Medicaid on the federal level and oversees the states' administration of Medicaid. Within broad federal rules, each state decides who is eligible for Medicaid, the services covered, payment levels for services, and administrative and operation procedures. The state directly pays providers, with the state obtaining the federal share of the payment from accounts which draw on funds of the United States Treasury. 42 C.F.R. §§ 430.0-430.30.

32.    The State of Alabama has participated in the Alabama Medicaid Program since its plan was approved, effective January 1, 1970. The State of Alabama administers its responsibilities under the Alabama Medicaid Program through the Alabama Medicaid Agency ("Alabama Medicaid").

33.    The Federal share of each state's Medicaid program varies state by state. In Alabama, the Federal share is approximately seventy percent; the state share is approximately thirty percent.

34.    To carry out its mission, Alabama Medicaid contracts with health care providers who agree to deliver services directly to those enrolled in the Alabama Medicaid Program and to bill Alabama Medicaid for those services.

35.    Enrolled providers of medical services to Medicaid recipients are eligible for reimbursement for covered services. Alabama regulations require all Medicaid providers to sign an Alabama Medicaid Provider Agreement when applying for participation. By signing the

agreement, the provider agrees, among other things, to keep any records necessary to disclose the extent of services the provider furnishes to recipients; to furnish Medicaid, the Secretary of HHS, or the State Medicaid Fraud Control Unit ("MFCU") such information and any information regarding payments claimed by the provider for furnishing services, upon request; to certify that the information on the claim is true, accurate, and complete; that the provider understands that payment of the claim will be from federal and state funds; and that any falsification, or concealment of a material fact may be prosecuted under federal and state laws.

36.    Alabama regulations also provide that the provider's signature on a claim form certifies that the services billed were performed by the provider or supervised by the provider and were medically necessary.

37.    The State of Alabama participates in the Medicaid program through the Alabama Medicaid Agency, which then works with other agencies. The Alabama Department of Human Resources ("DHR") certifies eligibility for foster children and children who receive state or federal adoption assistance.

38.    DHR both bills and is reimbursed for Medicaid services. DHR receives millions of dollars in Medicaid reimbursement annually through its Revenue Maximization efforts to fund child welfare programs.

### iii. DHR's Service Provider Agreement with Alabama Medicaid to Provide Rehabilitative Services, Including Basic Living Skills ("BLS").

39.    At all times relevant to the Complaint, Alabama Medicaid has had a service provider agreement with DHR for rehabilitative services to children under 21 years of age.

40.    Rehabilitative services are specialized medical services delivered by uniquely qualified practitioners designed to treat or rehabilitate persons with mental illness, substance abuse, or co-occurring mental illness and substance abuse diagnoses. Enrolled providers deliver

rehabilitative services to recipients based on medical necessity. Rules regarding rehabilitative services are available in Chapter 105 of the Alabama Medicaid Provider Manual and Chapter 47 of the Alabama Medicaid Agency Administrative Code.

41.     Basic Living Skills ("BLS") are one type of covered rehabilitative service. BLS are psychosocial services provided on an individual or group basis to enable a client to maintain community tenure and to improve his or her capacity for independent living. Key services include:

> a. training and assistance in developing or maintaining skills such as personal hygiene, housekeeping, meal preparation, shopping, laundry, money management, using public transportation, medication management, healthy lifestyle, stress management, and behavior education appropriate to the age and setting of the client; and
>
> b. patient education about the nature of the patient's illness, symptoms, and the client's role in managing the illness.

42.     BLS is to be billed in 15-minute increments and may include up to 20 individual units per day or 2080 units per year (code H0036 BLS-Individual) and 8 group units per day or 2080 units per year (code H0036-HQ BLS-Group).

43.     One unit of an individual BLS service is reimbursed at $14, while one unit of a group BLS service is reimbursed at $4.

44.     If a Medicaid provider receives payment for a recipient who is not its patient or if the provider is paid more than once for the same service, the provider must refund the Alabama Medicaid program.

### iv. Teen University's Contract with DHR to Provide BLS Services to Children DHR Entrusted to Teen University's Custody.

45.     At least from September 4, 2014, Teen University was an enrolled Medicaid provider when Defendant Smith entered a contract with Alabama DHR for the period of October 1, 2014 to September 30, 2016. Defendant Smith renewed that contract for the period of October

1, 2016, to September 30, 2018. Teen University was an active enrolled Medicaid provider until March 2018.

46.     Teen University agreed to provide congregate moderate residential services, including room, board, and an array of services for children with moderate emotional and/or behavioral management problems that interfered with the child's ability to function in the family, school, and/or community setting outside a residential environment.

47.     Moderate placement services are limited to children whose needs cannot be met in their own home, traditional foster care, basic residential care, or children who have reached their treatment goals in a more restrictive setting and are ready to be "stepped down." Children placed in a moderate residential setting require 24-hour awake staff for proper supervision to prevent and respond to various disruptive behaviors, including fighting at night, inability to sleep and wandering around, attempting sexual contact with other residents, and attempted runaway patterns.

48.     Children eligible for moderate placement services include those with a diagnosed mental illness or substance abuse needs, or who are delinquent, are chronic runaways, display manipulative behaviors, have difficulty maintaining self-control, are truant from school, and have difficulty in accepting authority. These children typically need clinical treatment to be able to function in school, home, or the community; have not responded successfully to less intensive treatment or have been denied admission or discharged from less restrictive placements because of emotional or behavioral disruption; or have behavior that is not well controlled without constant adult supervision or use of psychotropic medication.

49.     Teen University was required to cooperate with county DHR caseworkers to develop an Individualized Service Plan ("ISP") for each child at the time of his initial placement.

50.     The contract required Teen University to provide core services as a moderate residential program, including providing BLS training at a minimum of two hours daily in accordance with the outcomes identified in the child's ISP.

51.     DHR required Teen University to keep BLS progress reports for DHR and/or Medicaid reviews. Teen University was required to complete the BLS progress reports daily to comply with Chapter 105.2.3 of the Alabama Medicaid Provider Manual for Rehabilitative Services. The documentation for each session, service, or activity for which Teen University requested Medicaid reimbursement had to comply with applicable certification or licensure standards and had to include, at a minimum, the following:

    a.   the identification of the specific services rendered;

    b.   the date and the amount of time that the services were rendered;

    c.   the signature of the staff person who rendered the services;

    d.   the identification of the setting in which the services were rendered; and

    e.   a written assessment of the client's progress, or lack thereof, related to each of the identified clinical issues discussed.

52.     Documentation of the Medicaid recipient's signature, which could be kept on a sign-in log, service receipt, or any other record that could be used to indicate the client's signature and the date of service. Sign-in sheets were to be completed at the time of the service and were prohibited from being completed in advance or after-the-fact.

53.     Consistent with Medicaid reimbursement amounts, Teen University contracted to be reimbursed $4 per unit (15 minutes) of group BLS services, up to 8 units per day or 2080 units per year, and $14 per unit (15 minutes) of individual BLS services, up to 20 units per day or 2080 units per year.

54.    The Medicaid Withholding Policy specified that Teen University would bill for Medicaid reimbursable services so that DHR would receive Medicaid funds for disbursement back to Teen University. Teen University bore the primary responsibility to bill Alabama Medicaid for services rendered after accepting physical custody of children from DHR. After DHR received funds from Medicaid for services that Teen University billed, DHR would pay Teen University the funds available as specified under the contract. DHR would not pay the Medicaid portion to Teen University until payment was received from the Alabama Medicaid Agency.

55.    DHR would reimburse Teen University only for signed, original, and correctly certified statements of the total actual eligible costs incurred, or the total billable amount based on the actual total number of eligible units of service provided during the designated billing period. Teen University agreed to submit these certified statements to DHR monthly following the end of each month services were provided under the contract.

56.    The contract specified that if Teen University incurred less actual eligible and allowable costs or provided fewer actual units of services than the maximum amount authorized, Teen University would not be entitled to receive the difference.

57.    The contract provided that by requesting payment of funds under the contract, Teen University warranted and represented to DHR that all terms and conditions of the contract and all applicable federal and state laws, rules, and regulations had been fully met and satisfied.

**B. Teen University's Fraudulent Scheme**

58.    From January 2015 through April 2018, Teen University routinely billed Medicaid for the "maximum" BLS services allowed: two hours daily of individual BLS sessions, worth $112, and one hour daily of group BLS sessions, worth $16, for each resident entrusted to its care.

59.    A majority of the claims for reimbursement were false and fraudulent because Teen University was not entitled to reimbursement. Teen University did not provide many of the BLS services that it claimed, it lacked documentation to support many of the BLS services, and much of the documentation that it did have revealed discrepancies that otherwise violated Medicaid reimbursement rules.

60.    One of the primary issues was that Teen University lacked BLS documentation to support BLS services that it had submitted to Medicaid for reimbursement.

   a.  As a Medicaid enrolled provider, Teen University was required to maintain and retain all necessary records to fully document the services and supplies provided to a recipient with Medicaid coverage. By submitting a claim for reimbursement, Teen University certified that the services billed were performed or supervised by the provider and were medically necessary.

   b.  These claims were false because Teen University was not entitled to reimbursement. Either Teen University did not provide the services it claimed, or it was not entitled to reimbursement because it violated the requirement to keep records necessary to document the services rendered.

   c.  One example of a claim for reimbursement that was not supported by the necessary documentation was claim ICN 2217153006601 for BLS services provided to minor resident Q.B. from May 10, 2017 to June 1, 2017. Teen University billed 56 units of group BLS training and thus submitted a claim for $224, but it had documentation to support only one of those sessions, allegedly provided by a program director. But that one session was also false and

14

fraudulent: the program director admitted that he did not provide any BLS services to Q.B.

61. Not only did Teen University fail to provide many of the BLS services it claimed when it sought Medicaid reimbursement, but it created false documentation to cover its tracks. Teen University created false documentation, including false BLS notes, in response to subpoenas issued by the Alabama MFCU. Teen University produced BLS notes that employees did not write and/or that reflected services they did not provide. The following is a non-exhaustive list exemplifying some of these issues:

    a. Teen University submitted claims for individual BLS sessions allegedly provided by a nighttime security guard who did not provide any BLS services to residents.

    b. Teen University submitted claims for individual and group BLS sessions that a Teen University employee allegedly provided from July 2015 to September 2017, but that employee explained that he did not provide any BLS services during the review period of 2015 to 2018. Instead, in response to the Alabama MFCU subpoena, Teen University management gave this employee a stack of BLS notes for him to sign that did not reflect services he provided.

    c. One example of a Medicaid claim that Teen University submitted and for which it received payment is ICN 2217167009510, for services provided to minor resident J.D. from June 2, 2017, to June 15, 2017. The claim shows 60 units of group BLS services billed and 120 units of individual BLS services billed for J.D, for a total of $1,920 billed and paid. Teen University created false documentation to support the claim, including BLS notes showing that the

nighttime security guard provided two hours of individual BLS services to J.D. for twelve days, and that the employee who admitted that he did not provide any BLS services during this time period provided group BLS sessions all 14 days for an hour each day, including on days and times his timesheet shows that he was off work.

    d.  Teen University submitted claims for reimbursement reflecting BLS services that employees did not provide because they were not at work at the time of service. For example, documentation to support claims 2217167008787 (for minor resident C.B.) and 2217167008721 (for minor resident Q.B.) revealed that one Teen University employee supposedly provided individual BLS services to both Q.B. and C.B. from 3 to 5 pm on June 6, 2017, while that employee was on leave because of a workplace injury. The documentation was false and fraudulent because the Teen University employee did not provide the BLS services and because Teen University double billed that employee's time for individual sessions allegedly provided to two residents at the same time.

    e.  Some of Teen University's false documentation to support its Medicaid claims was for an employee who had not yet started working at Teen University. For example, in claim 2217188011677 for BLS services allegedly provided to minor resident D.A. from June 16 to July 6, 2017, Teen University submitted documentation for six individual BLS sessions for an employee who did not begin working at Teen University until July 17, 2017.

62.    Teen University's CEO, Defendant Smith, was responsible for Teen University's practice of routinely billing Medicaid for the "maximum" amounts of BLS services regardless of

whether the services were provided or whether Teen University had the documentation to support it. He was likewise responsible for the creation of false BLS documentation in response to the Alabama MFCU subpoenas. He actually knew, was deliberately ignorant about, or recklessly disregarded Teen University's fraudulent practices, but did not stop the practices.

63.     Defendant Smith became aware that Medicaid had overpaid Teen University at least by the time he was interviewed during the investigation. Despite this knowledge, Defendants did not conduct an internal investigation to determine the extent to which it had submitted false claims to Medicaid. Neither Teen University nor its CEO Defendant Smith have repaid Medicaid for any overpayments.

64.     As a result of Defendants' fraudulent course of conduct, Teen University and Defendant Smith materially benefitted from Teen University's submission of false claims by receiving revenue from reimbursements to which Teen University was not entitled, had the Defendants complied with Medicaid rules and regulations for submitting claims and repaying overpayments.

## V.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION
False Claims Act: Presentation of False or Fraudulent Claims
31 U.S.C. § 3729(a)(1)(A)

65.     The United States re-alleges and incorporates by reference the allegations of paragraphs 1 through 64.

66.     By virtue of the acts described above, beginning in or around January 2015, and continuing through March 2018, Defendant Teen University and Defendant Smith knowingly presented or caused to be presented false or fraudulent claims for payment or approval to Alabama

Medicaid, a joint federal and state health care program, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

67.    Teen University sought to be reimbursed by Medicaid for individual and group BLS sessions it did not perform.

68.    Teen University also sought to be reimbursed by Medicaid for individual and group BLS sessions for which it lacked sufficient documentation to comply with requirements for payment.

69.    Defendant Smith was responsible for Teen University presenting false and fraudulent claims to Medicaid when employees billed Medicaid even when services had not been provided. Defendant Smith actually knew, was deliberately ignorant to, or deliberately disregarded information about employees submitting false claims for payment.

70.    These false claims caused the United States to suffer actual damages in an amount to be determined at trial, and therefore is entitled under the False Claims Act to treble damages plus a civil penalty for each false or fraudulent claim.

**SECOND CAUSE OF ACTION**
False Claims Act: Making or Using False Records or Statements
31 U.S.C. § 3729(a)(1)(B)

71.    The United States re-alleges and incorporates by reference the allegations of paragraphs 1 through 64.

72.    By virtue of the acts described above, Defendant Teen University and Defendant Smith knowingly made, used, or caused to be made or used false or fraudulent records submitted in support of Medicaid claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

73.     Teen University created false and fraudulent BLS daily progress notes that purported to be real progress notes reflecting actual services provided, but in reality, were created in response to Alabama Attorney General subpoenas to support claims that Teen University had already submitted to Medicaid for services not provided or insufficiently supported.

74.     Defendant Smith was responsible for Teen University creating the false and fraudulent BLS records when employees provided documents in response to the Alabama Attorney General subpoenas. Defendant Smith actually knew, was deliberately ignorant to, or deliberately disregarded information about employees creating the false records and statements.

75.     These false records and statements were material to false and fraudulent claims that caused the United States to suffer actual damages in an amount to be determined at trial, and therefore is entitled under the False Claims Act to treble damages plus a civil penalty for each false or fraudulent claim.

### THIRD CAUSE OF ACTION
False Claims Act: Reverse False Claim
31 U.S.C. § 3729(a)(1)(G)

76.     The United States re-alleges and incorporates by reference the allegations of paragraphs 1 through 64.

77.     By virtue of the acts described above, Defendant Teen University and Defendant Smith knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the United States, through the Alabama Medicaid program.

78.     These actions to conceal, avoid, or decrease Teen University's obligation to pay or transmit money to the United States were made with actual knowledge, or with reckless disregard or deliberate ignorance.

79.    The Defendants' fraudulent conduct caused the United States to suffer actual damages in an amount to be determined at trial, and therefore is entitled under the False Claims Act to treble damages plus a civil penalty for each false or fraudulent claim.

## FOURTH CAUSE OF ACTION
### Unjust Enrichment

80.    The United States re-alleges and incorporates by reference the allegations of paragraphs 1 through 64.

81.    This is a claim for the recovery of monies by which Teen University and Defendant Smith have been unjustly enriched.

82.    By directly and indirectly obtaining Government funds to which Teen University and Defendant Smith were not entitled, Teen University and Defendant Smith were unjustly enriched, and Defendants are liable to account and pay such amounts, or the proceeds therefrom, which are to be determined at trial, to the United States.

83.    As an alternate theory of legal recovery, the Defendants hold money that, in equity and good conscience, belongs to the United States. The money was paid to them as reimbursement for Medicaid claims to which they were not entitled. This money never should have been paid to the Defendants and belongs to the United States. It should be returned.

84.    The United States is entitled to restitution of all moneys paid to Defendants along with attorneys' fees, interest, court costs, and any other legal or equitable remedies the Court deems just.

## FIFTH CAUSE OF ACTION
### Payment by Mistake

85.    The United States re-alleges and incorporates by reference the allegations of paragraphs 1 through 64.

86.     This is a claim for the recovery of money paid by the United States to Teen University, through Alabama Medicaid reimbursement, as a result of a mistaken understanding of facts.

87.     The claims that Defendants submitted or caused to be submitted to the federal health care programs were paid by the United States and the State of Alabama based upon mistaken or erroneous understandings of material facts caused by Defendants.

88.     The United States, directly and through the State of Alabama, acting in reasonable reliance on the truthfulness of the claims, and Defendants' certifications and representations, paid Teen University certain sums of money to which it was not entitled, and Defendants are thus liable to account and pay such amounts, which are to be determined at trial, to the United States.

## PRAYER FOR RELIEF

The United States requests that judgment be entered in its favor and against the Defendants as follows:

- On the First, Second, and Third Claims for relief, for treble the United States' damages in an amount to be determined at trial, plus a statutory penalty for each false claim submitted in violation of the False Claims Act;

- On the First, Second, and Third Claims for relief, an award of costs pursuant to 31 U.S.C. § 3729(a)(3);

- On the Fourth and Fifth Claims, for restitution of all moneys paid to Defendants along with attorneys' fees, interest, court costs; and

- Any further legal or equitable relief the Court deems proper.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38, the United States respectfully requests trial by jury on all issues so triable.

Respectfully submitted this 21st day of January, 2026.

KEVIN P. DAVIDSON
ACTING UNITED STATES ATTORNEY


By: */s/ Stephen D. Wadsworth*
Stephen D. Wadsworth
Assistant United States Attorney
Alabama Bar No. ASB 9808 E47W
E-mail: Stephen.Wadsworth@usdoj.gov
United States Attorney's Office
Middle District of Alabama
Post Office Box 197
Montgomery, AL 36101-0197
Telephone: (334) 223-7280


## CERTIFICATE OF SERVICE

By agreement of the parties, a copy of the complaint will be served on Defendants' attorney, Ms. Carmella J. Penn, electronically.

By: */s/ Stephen D. Wadsworth*
STEPHEN D. WADSWORTH
Assistant United States Attorney